

EXHIBIT
A

## IN THE DISTRICT COURT OF POTTAWATTAMIE COUNTY, IOWA

| | |
|---|---|
| DANIEL MOLLOY, an individual, | |
| Plaintiff, | CASE NO.: LACV 110012 |
| vs. | |
| SR MIDWEST 1, LLC., a Delaware Limited Liability Company, | COMPLAINT |
| Defendant. | |

COMES NOW Plaintiff, Daniel Molloy, by and through his counsel of record Taylor, High & Younes, LLC., and for his Complaint against Defendant, SR Midwest 1, LLC. (hereinafter "SRM1"), states and alleges as follows:

### I. PARTIES

1. Plaintiff is and was at all relevant times herein, an individual residing in Omaha, Douglas County, Nebraska; an owner of Sarie's Lounge, LLC. (hereinafter "Sarie's"), an Iowa Limited Liability Company with home office of 2449 N. 13th Street, suite 200, Carter Lake, Iowa; and an owner of World Class Venues, LLC. (hereinafter "WCV"), an Iowa Limited Liability Company.

2. SRM1 is and was at all times relevant herein, a Delaware Limited Liability Company registered with the Iowa Secretary of State as a Foreign Limited Liability Company, with a registered agent address of 505 5th Avenue, Suite 729, Des Moines, Iowa; an owner of Sarie's Lounge, LLC. (hereinafter "Sarie's"), an Iowa Limited Liability Company with home office of 2449 N. 13th Street, suite 200, Carter Lake, Iowa; and an owner of World Class Venues, LLC. (hereinafter "WCV"), an Iowa Limited Liability Company.

### II. VENUE

1

3. The incidents described in this Complaint occurred between November 2011 and this date, in Carter Lake, Pottawattamie County, Iowa.

4. Venue is appropriate pursuant to Iowa Code Annotated §§ 616.1, 616.4 and 616.7 as Pottawattamie County is where the cause of action arose, the herein contracts were executed, and to be performed, where the real property at issue is located, and where both Plaintiff and SRM1 regularly conduct business by way of their membership in Sarie's and WCV, which are domestic limited liability companies which they operate their business of a bar, lounge and gentleman's club in Carter Lake, Pottawattamie County, Iowa.

### III. STATEMENT OF FACTS

5. Prior to November 2011, WCV was owned by Plaintiff and an individual named Jeremy Barnett, as follows:

   a. Plaintiff 51%

   b. Barnett 49%.

6. Prior to November 2011, Sarie's was wholly owned by Plaintiff.

7. WCV and Sarie's, together, operated the business known as Sarie's Men's Club, located at and about 2449 North 13th Street, Carter Lake, Iowa, 51510 and 2445 Abbot Drive (the "Premises").

8. On or around November 9, 2011, Barnett and SRM1 entered into a contract whereby Defendant agreed to purchase all of Barnett's ownership interest in WCV, 49% ownership interest.

9. On or around November 9, 2011, Plaintiff and Defendant executed a document titled, "Sale of Majority Ownership Interest In Limited Liability Company and Members Management Operating Agreement", and on November 10, 2011 a document titled

2

"Amendment to Sale of Majority Ownership Interest in Limited Liability Company and Members Management Operating Agreement" hereinafter collectively referred to as "Agreement" or "Agreements", copies of which are attached as **Exhibits A and B**, respectively.

10. The Agreements constituted a sale of certain ownership interest in WCV and Sarie's, as follows:

    a. Plaintiff was to transfer a 2% ownership interest in WCV to Defendant, so that the ownership interest would become as follows:

        i. SRM1 51%

        ii. Plaintiff 49%

    b. Plaintiff was to transfer 51% ownership interest in Sarie's to Defendant, so that the ownership interest would become as follows:

        i. SRM1 51%

        ii. Plaintiff 49%

11. Under the transaction Agreements, Defendant agreed to purchase from Plaintiff such portion of Plaintiff's ownership in and of each of the Companies for the total sum of One Hundred Thousand Dollars ($100,000.00), payable Twenty-Five Thousand Dollars ($25,000.00) commencing the first day of the month following thirty (30) days after the Premises opened and commenced trading to the general public under the trade name Spearmint Rhino Gentlemen's Club (SRGC) and continuing the first day of each consecutive calendar month thereafter for three (3) additional months until the total purchase price of $100,000.00 is paid.

12. SRM1 has made no payments to Plaintiff for the amounts detailed in paragraph 10 of

this Complaint.

13. Under the transaction Agreements, on the 15th day of each month after the execution of the Agreements, the Companies (WCF and Sarie's) were to distribute to the owners of the companies (Plaintiff and SRM1), in percentage of each owner's then respective ownership interest in the respective Company, all of the funds retained in each of the Companies the respective single bank account derived from gross revenues over and beyond Thirty-Five Thousand Dollars ($35,000.00) and after deduction and provisions for all accounts, loans, and related payable and debts of the Companies.

14. SRM1 has made no payments to Plaintiff for the amounts detailed in paragraph 12 of this Complaint.

15. Under the Agreement, on each annual anniversary month of the Agreement for two [2] years after the date of the Agreement (September 2012 and September 2013), the Companies were to endeavor to distribute to Plaintiff a minimum combined annual shareholder distribution of Twenty-Five Thousand Dollars [$25,000.00] comprised and calculated from the preceding twelve [12] months operations of the Companies and if Companies have not made sufficient net revenues to support such disbursements, the Companies shall advance as a interest free loan payable from thereafter shareholder distribution, to Plaintiff the difference between that so distributed to Plaintiff and said $25,00000 for each of the two [2] years.

16. The Companies, operated by SRM1 have made no payments to Plaintiff pursuant to the terms outlined in paragraph 14 of this Complaint.

17. Under the Agreements, Plaintiff agreed to indemnify and hold safe and harmless SRM1 from any debt owed by the Companies at the time of the execution of the Agreement over

4

Two-Hundred Thousand Dollars [$200,000.00], but only to the maximum of 60% of the total amount over $200,000.00, and which would be payable from the amounts distributable to Plaintiff.

18. "Amounts distributable" in the preceding paragraph of this Complaint refers to the funds derived from the gross revenue generated by the operation of the business as referred to in paragraph 12 of this Complaint, and not to the $100,,000.00 owed to Plaintiff as described in paragraph 10 of this Complaint.

19. Under the Agreement, at any time after twelve (12) months from the date that Barnett executed an agreement to sell his interest in WCV to Defendant, Plaintiff has the right to exercise his right to sell his interest to SRM1, and that the purchase price of Plaintiffs membership interests shall be the greater of (i) $500,000.00 or (ii) the fair market value of the Companies.

20. On or around August 14, 2012, pursuant to the Agreement, SRM1 made a payment to Plaintiff in the amount of $25,000.00.

21. On or around September 4, 2012, pursuant to the Agreement, SRM1 owed Plaintiff $25,000.00, and SRM1 only made a payment to Plaintiff in the amount of $16,349.00.

22. On or around October 1, 2012, pursuant to the Agreement, SRM1 made a payment to Plaintiff in the amount of $25,000.00.

23. On or around November 1, 2012, pursuant to the Agreement, SRM1 owed to Plaintiff $25,000.00, and SRM1 failed to make any payment to Plaintiff.

24. SRM1 failed to pay Plaintiff as required by the Agreements the full $25,000.00 owed to Plaintiff in November 2012.

25. In September and November 2012, demand was made upon SRM1 to pay sum then due and owing

26. Even after demand was made upon SRM1 to pay the sum due and owing for September and November 2012, SRM1 made no payment to Plaintiff and no payment was received.

27. Since SRM1 has undertaken the operation of the Companies it has not accounted for its expenses, costs or profits to Plaintiff.

28. In addition, expenses and costs SRM1 has shown to Plaintiff for its operations of the Companies appear to be overstated and exaggerated.

29. SRM1 has made many payments out of the Companies [WCV/Sarie's] bank accounts to itself and its parent companies for alleged "consulting fees" and other items, but provides no basis for these charges.

30. The consulting fees and other charges set forth in paragraph 28 of this Complaint are unjustified and used to usurp money from the Companies of the partnership [WCV and Sarie's] without showing a profit and paying Plaintiff his equitable share of the profits.

31. The Agreements executed between Plaintiff and SRM1 provide that if the premises, and land on which it is located, is purchased it shall be purchased by the Companies [WCV or Sarie's].

32. If the land was purchased by the Companies [WCV or Sarie's] it would become an asset of the Companies, increasing their value and profitability by reducing rent expenses.

33. Prior to entering into the Agreements, the Companies [WCV and Sarie's] collective lease payments to Wings Flyway Bar & Grill, LLC. (hereinafter "Wings"), the owner of the premises, totaled twelve thousand six hundred dollars [$12,600.00], per month.

34. Following the execution of the Agreements between Plaintiff and SRM1, SRM1 acquired all of the ownership interest in Wings, which owns the premises.

35. It is believed that SRM1 acquired Wings, herego the premises Wings' sole asset, for a price of approximately $1,225,000.00.

36. Wings has no other business interest or activity other than the ownership of the premises.

37. At some point following the time SRM1 began operating the Companies and SRM1's acquisition of Wings, the Companies [WCV and Sarie's] began paying an increased lease payment for the premises in the amount of fifteen thousand dollars [$15,000.00], per month each, for a total lease payment of thirty thousand dollars [$30,000.00] per month.

38. This increased lease payment is more than double the lease payment prior to SRM1's purchase of wings, or seventeen thousand four hundred dollars [$17,400.00] per month higher.

39. Again, this is another manner in which SRM1 has redirected the profits of the Companies [WCV and Sarie's] to itself, and to the exclusion of Plaintiff.

40. It is believed that various other expenses are unnecessary and exaggerated for the mere purpose of decreasing the Companies' profits to the disadvantage of Plaintiff.

## **FIRST CAUSE OF ACTION**

## **IV. BREACH OF CONTRACT**

41. Plaintiff incorporates paragraphs 1 through 38 of this Complaint as if fully plead.

42. Plaintiff has fully comply with his contractual obligations under the Agreement while SRM1 has repeatedly failed to pay Plaintiff as required by the Agreement and SRM1 has thereby materially breached the agreement.

43. As a result of SRM1's breach, Plaintiff was deprived of a sum of money due and owed to Plaintiff as follows:

    a. Fifty thousand dollars [$50,000.00] unpaid of the principal purchase price of one hundred thousand dollars [$100,000.00];

    b. Twenty five thousand dollars [$25,000.00] payable in September of 2012;

    c. Forty-nine percent [49%] of all sums in excess of thirty-five thousand dollars [$35,000.00] held in the Companies' bank account on the last day of each month for the months beginning in October 2011 through the present day, as proven at trial; and

    d. Additional amounts to be determined at trial.

44. SRM1 breached the contract of the Agreements when they purchased Wings to the disadvantage of Plaintiff.

45. SRM1's purchase of Wings has decreased the value of the Companies, the value of Plaintiff's interests in the Companies, the Companies' profitability, and Plaintiff's profitability.

46. Plaintiff's interest in the premises, if it was purchased by the Companies as set forth in the Agreement, would be 49%, or $600,250.00, the increased value of WCV's assets.

47. Plaintiff was proximately damaged by SRM1's material breach of the Agreement when SRM1 purchased Wings.

### THIRD CAUSE OF ACTION

### VI. BREACH OF FIDUCIARY DUTY

48. Plaintiff incorporates paragraphs 1 through 43 of this Complaint as if fully plead.

49. The parties to this action were corporate partners that had a duty of good faith and fair dealing to each other.

50. That the parties to this action had a business expectation that WCV would purchase the building at issue. Further, the building was necessary to carry out the corporate purpose of WCV.

51. That SRM1 knew or should have known that by purchasing the building WCV and Malloy would be damaged in contravention of SRM1's obligation to WCV and Malloy.

52. That SRM1 knew or should have known that SRM1's operation of the business was to the detriment of WCV and Plaintiff and in contravention of SR's obligation to WCV and Malloy.

53. That SRM1 has incurred additional, exaggerated, and unnecessary expenses to the detriment of Plaintiff and the advantage of SRM1.

54. That SRM! knew or should have known that SRM!'s operation of the Companies in the manner that it did was to the determined of WCV and Plaintiff.

55. The Companies and Plaintiff have been damaged by SRM1's breach of its fiduciary duties to the Companies and Plaintiff by SRM1's operation of the Companies.

56. SRM1's breach of its fiduciary duty it owed to Plaintiff proximately caused Plaintiff damages.

## FOURTH CAUSE OF ACTION

## VII. FRAUDULENT MISREPRESENTATION

57. Plaintiff incorporates paragraphs 1 through 52 of this Complaint as if fully plead.

58. That agents/representatives of SRM1 stated that building, if purchased, would be purchased in the name of WCV. Further that agents/representatives of SRM1 were not truthful in describing their positions with SRM.

59. That the agents/representatives of SRM1 have been untruthful in its operation of the Companies and certain expenses incurred by the Companies under SRM1's control.

60. That these representations were made with the knowledge that Plaintiff would reasonably rely on them to his detriment.

61. That as a result of Plaintiff's reasonable reliance on these misrepresentations he has suffered damages.

9

62. SRM1's misrepresentation proximately caused Plaintiff's damages.

## FIFTH CAUSE OF ACTION

## VIII. NEGLIGENT MISREPRESENTATION

63. Plaintiff incorporates paragraphs 1 through 58 of this Complaint as if fully plead.

64. That agents/representatives of SRM1 stated that building, if purchased, would be purchased in the name of WCV. Further that agents/representatives of SRM1 were not truthful in describing their positions with SRM.

65. That the agents/representatives of SRM1 have been untruthful in its operation of the Companies and certain expenses incurred by the Companies under SRM1's control.

66. That these representations were made with the knowledge or reasonable expectation that Plaintiff would reasonably rely on them to his detriment.

67. That as a result of Plaintiff's reasonable reliance on these misrepresentations he has suffered damages.

68. SRM1's misrepresentation proximately caused Plaintiff's damages.

## SIXTH CAUSE OF ACTION

## IX. BREACH OF DUTY OF GOOD FAITH AND FAIR DEALINGS

69. Plaintiff incorporates paragraphs 1 through 64 of this Complaint as if fully plead.

70. SRM1 owes a duty of good faith and fair dealings to Plaintiff by virtue of entering into contracts with Plaintiff and by operating the Companies as Plaintiff's partner.

71. An obligation of good faith is imposed upon every contract or duty by the UCC.

72. SRM1 breached its duty of good faith and fair dealings by repeatedly acting in the best interest of SRM1 and its parent companies to the detriment of the Companies and Plaintiff.

73. SRM1 breached its duty of good faith and fair dealings by wrongfully withholding payments to Plaintiff, refusing to honor the previously established agreements, and

maliciously attempting to reduce the value of the Companies by diverting its assets, among other things.

74. SRM1's breach of its duty of good faith and fair dealings it owed to Plaintiff proximately caused Plaintiff's damages.

## SEVENTH CAUSE OF ACTION

## X. PROMISSORY ESTOPPEL

75. Plaintiff incorporates paragraphs 1 through 70 of this Complaint as if fully plead.

76. SRM1 made clear and definite promises to Plaintiff that if the premises were purchased it would be by WCV.

77. SRM1 made clear and definite promises to Plaintiff that it would operate the Companies in a fair and equitable manner.

78. Plaintiff acted in reasonable reliance of SRM1's promises by executing the Agreements and allowing SRM1's operation of the Companies.

79. SRM1 has acted in a manner contrary to its promises to Plaintiff.

80. SRM1's actions have proximately caused Plaintiff to incur damages.

## NINTH CAUSE OF ACTION

## XII. TORTIOUS INTERFERENCE

81. Plaintiff incorporates paragraphs 1 through 76 of this Complaint as if fully plead.

82. SRM1 tortiuosly interfered with a business expectancy of the Companies [WCV and Sarie's] and Plaintiff by purchasing Wings.

83. A valid contract existed between WCV and Wings for the lease of the premises, and first right to purchase.

84. A valid contract existed between SRM1 and Plaintiff that prohibited SRM1 from purchasing the premises and stated that if it was to be purchased it could only be purchased by WCV, the partnership of SRM1 and Plaintiff.

85. SRM1 had knowledge of both of the contractual relationships set forth in paragraph 79 and 80 of this Complaint.

86. SRM1 intentionally interfered with both of these contracts, set forth in paragraph 79, 80, and 81, of the Complaint by attempting to circumvent the agreements and purchasing Wings, whose sole business existence is to own the premises.

87. SRM1 improperly interfered with both of these contracts, set forth in paragraph 79, 80, and 81, of the Complaint by attempting to circumvent the agreements and purchasing Wings, whose sole business existence is to own the premises.

88. SRM1 further interfered with the business expectancy of of the Companies [WCV and Sarie's] and Plaintiff by doubling the lease payments of the Companies after it acquired control of the Companies and acquired Wings, thus artificially decreasing the profits of the Companies, decreasing the profit to be received by Plaintiff, and increasing the profit received by SRM1.

89. SRM1's tortious interference proximately resulted in damage to the Companies and Plaintiff.

### TENTH CAUSE OF ACTION

### XIII. CONSTRUCTIVE TRUST

90. Plaintiff incorporates paragraphs 1 through 85 of this Complaint as if fully plead.

91. SRM1 obtained title to the building through fraud, misrepresentation, or the abuse of a confidential or influential relationship.

92. Because of how SRM obtained title they should not continue to hold or enjoy title to the property and all moneys earned by the property should be held in a constructive trust until the Court determines the best manner to dispose of the property.

93. SRM1 has been operating the Companies to its own advantage and at the disadvantage of its partner, Plaintiff.

94. SRM1 has been operating the Companies in a manner causing increased and false expenses in order to divert profits to itself or its parent companies.

95. As such all profits and money earned by the Companies should be placed in a constructive trust, except for monies for ordinary goods necessary to operate the business such as utilities, food, and beverages.

## XIV. DAMAGES

96. Plaintiff incorporates paragraphs 1 through 91 of this Complaint as if fully plead.

97. As a direct and proximate result of SRM1's actions or inactions, Plaintiff seeks the following damages:

    a. Fifty thousand dollars [$50,000.00] for unpaid of the principal purchase price of one hundred thousand dollars [$100,000.00];

    b. Twenty five thousand dollars [$25,000.00] which was supposed to be paid to Plaintiff in September of 2012;

    c. Forty-nine percent [49%] of all sums in excess of thirty-five thousand dollars [$35,000.00], held in the Companies' bank account on the last day of each month for the months beginning in October 2011 through the present day, as proven at trial, after all unnecessary, fraudulent, excessive, or other expenses caused by SRM1's breach of its duties are removed;

13

d.  $600,250.00 for 49% of the value of the premises which should have been purchased by the Companies rather than SRM1;

e.  Forty-nine percent [49%] of all lease payments made to Wings after SRM1 acquired Wings, which represents profits which should have been retained by the Companies had SRM1 not improperly acquired Wings.

f.  Additional amounts to be determined at trial;

g.  Punitive Damages;

h.  Attorney's fees;

i.  Costs; and

j.  Pre-judgment interest.

WHEREFORE, Plaintiff Daniel Molloy, prays that this court enter judgment against Defendant, SR Midwest 1, LLC., and its agents and representatives on all Causes of Action in an amount to be determined at trial together with punitive damages, interest, attorneys fees, and court costs incurred herein, and for such other and further relief the Court deems just and equitable under the premises. In addition, Plaintiff prays that this Court place all income earned by the Companies [WCV and Sarie's] in a constructive trust and transfer title of the premises to the Companies and return all lease payments made to Wings, by the Companies, to the Companies for equitable distribution to Plaintiff.

DANIEL MOLLOY, Plaintiff.

By: _____
Frank Younes, AT11116
TAYLOR, HIGH & YOUNES, LLC.

14

661 North 50th Street, Suite 200
Omaha, NE 68132
Ph:     402-933-3345
Fax:    402-933-3020
Email: Frank@THYLaw.com
*Attorneys for Plaintiff.*

## SALE OF MAJORITY OWNERSHIP INTEREST IN LIMITED LIABILITY COMPANY AND MEMBERS MANAGEMENT OPERATING AGREEMENT

This Sale of Majority Ownership Interest in Limited Liability Company and Members Management Operating Agreement (the "Agreement") is entered into as of the date fully executed by and among, SR Midwest 1, LLC, a Delaware Limited Liability Company, (the "Buyer"); World Class Ventures, LLC, a Iowa Limited Liability Company (the "WCV"); Surie's Lounge, LLC, an Iowa Limited Liability Company ("SL"); and Dan Molloy, an individual (Molloy"), with reference to the following facts:

### RECITALS

A.    Buyer is a Delaware Limited Liability Company

B.    WCV and SL (collectively herein referred to as "Companies") are Iowa Limited Liability Companies. The Companies are in good standing and order in all regards with all parties including all governmental agencies and are fully empowered at the date hereof to contract and to further enter into this Agreement.

C.    WCV has only two (2) owners and members referenced as Molloy and Jeremy Barnett ("Barnett") who are the only owners of WCV - both actual and beneficial. Molloy and Barnett have held discussions and negotiations prior to the date hereof regarding their respective ownership in the Companies and sale of some or all of their respective interests to Buyer. SL is owned solely by Molloy.

D.    Buyer shall negotiate a purchase of 100% of Barnett's membership interests in the Companies, upon such terms as are acceptable to Buyer, (including, but not limited to, the execution by Barnett of such documents as Buyer may require) and in the event that Buyer is not able to finalize a purchase of 100% of Barnett's membership interests, at Buyer's sole option, this Agreement shall then terminate and be of no further force and effect.

E.    Molloy warrants and represents that neither Company owes in any manner whatsoever, any debt or obligation to Molloy except as provided in this Agreement, and Molloy hereby forever waives, forgives and discharges any and all debt and/or obligation of any and all natures whatsoever that is or may have been owed by the Companies to him.

F.    In accordance with this Agreement Molloy agrees to transfer such portion of his membership interests in the Companies so that upon completion of the purchase of Barnett's membership interests the Buyer shall own 51% of the membership interests in the Companies and Molloy shall own 49%.

G.    Molloy herewith provides Buyer with copies of all original and subsequent formation documents, membership agreements, management agreements and related documents,

Initials:    Buyer ___    WCV ___    SL ___    Molloy ___

Page 1 of 13



without exception.

H.     All ownership interests in the Companies are validly issued, fully paid, nonassessable, and said interests have been issued respectively to Molloy and Barnett in full compliance with all federal and state laws.  There are no outstanding subscriptions, options, rights, warrants, or other agreements or commitments obligating the Companies individually or collectively and/or Molloy to issue or transfer any additional or existing shares or interest of any class or ownership interest in, of and/or to the Companies in any manner whatsoever.  The Companies and Molloy, and each of them, acting alone and/or together in any manner do not have any agreements with any party regarding any ownership interest of the Companies or the sale or transfer of any portion thereof.

I.     Throughout this Agreement the parties hereto and each of them agree that where reference to the Companies is made -- all such references are made regarding each WCV and SL individually as well as jointly and severally.  All interests are held free and clear without restriction and the ownership of all the Companies' interests are evidenced by an operation/management agreement, true, complete and correct copies of which are attached hereto as Exhibit "A".  At the time of execution of this Agreement, Molloy and Barnett are the sole owners of the Companies as described in Recital C above, and its business known as Sarie's Lounge, as operated at and about 2449 North 13th Street, Carter Lake, Iowa 51510 and 2445 Abbott Drive, Omaha, Nebraska (the "Premises").  All ownership interest in the Companies, both beneficially and of record, are held free and clear of all liens, encumbrances, security agreements, equities, options, claims, charges, and restrictions.  The Companies and Molloy and Barnett each respectively and individually retain the full power and authority to transfer their respective ownership interest without obtaining the consent or approval of any other person or entity, public or private.  To the extent that the Molloy or the Companies are required by the respective Company's operating agreement to obtain the consent of the Company or its members prior to the transfer of Molloy's interest in the Company, Molloy shall obtain a waiver of such requirement by Barnett and the Company.

F.     There are no other members, managers, owners, officers or directors, actual or beneficial, of or to the Companies other than those detailed hereinabove.

G. Buyer acknowledges that the Companies' annual income tax returns for 2008, 2009 and 2010 and some of the 2008, 2009 and 2010 sales tax and payroll tax returns have not been filed or paid, as further described in 1A below, Existing Debt; and further acknowledges that there may be additional liabilities such as penalties and interest pertaining to the taxes which will remain liabilities of the Companies.  All such liabilities included in 1A which in total does not exceed $200,000.00.

H.  The Companies are not a party to any actual or pending disputes, litigation or suits of any nature.

I.     The Companies are current on all trade and other accounts payable except Existing Debt.  Molloy herein warrants and represents and holds Buyer safe and harmless, also

with right of offset on payments hereunder due from Buyer to Molloy and future income and profits from the Companies, from any and all debts, obligations and liabilities, known and unknown, suspected and unsuspected, actual and contingent, originating from the beginning of time through the date of this Agreement other than those provided for in 1A.

J. The Companies are not a maker or guarantor or otherwise a party to any loan or debt of any nature to any party whatsoever not otherwise specifically disclosed and detailed herein.

K. The Companies are in complete legal and actual possession of all the personal property located at Premises except for the ATM Machine and the four high end 250 studio spots.

L. WCV retains a valid lease in full force and effect without default, except as Existing Debt, for its operating premises at the addresses detailed above to wit: including 2449 North 13th Street, Carter Lake, Iowa 51510 (the "Premises"). A copy of the lease for the Premises is attached hereto as Exhibit "B" and referenced as the "Lease" herein. The Lease retains a valid option to purchase the Premises. There have been no addendums, revisions or modification of the Lease in any manner from the form of the Lease attached hereto, and no notice of default has been issued by Landlord to WCV, SL or the Sellers as of the date of their respective execution of this Agreement.

M. The sole and only business concern, location and related assets and liabilities of the Companies is the Premises and real property described herein along with the entertainment business involving live female pasty and bikini entertainment, or the equivalent, operated at the Premises known by the name Sarie's Lounge and all property associated therewith. This Sarie's Lounge name is wholly owned by the Companies. The Companies since their respective formations have not engaged in any other business or operated at any other location. The parties hereto and each of them, acknowledge and agree that the Buyer may change the operating name of the Premises as currently known by the public.

N. The Companies retain full right and authority, without pending action against this right, to operate at the Premises an entertainment business involving live female bikini entertainment, or the equivalent, performing both stage and lap dances. The Companies retain a liquor license and as such may serve all alcoholic beverages. All permits and licenses are validly issued and absent any litigation in the past, present and none is known or anticipated in the future.

O. While attempting to do the best possible in the circumstances, the Companies and Molloy incurred great difficulties both financially and operationally. For at least the last three (3) years the Companies have lost money. Neither Molloy nor the Companies have or desire to expend additional monies in an attempt to increase sales and profits of the Companies. Molloy desires to have an association with Buyer and failing such an association, may not be able to continue operations of the Premises. Further, the Premises are in need of additional non-structural interior partitions and furnishings. Molloy feels that an association via this Agreement with the Buyer will improve both management and income of the Companies and Molloy

Initials:    Buyer: _____  WCV: _____  SL: _____  Molloy: _____

warrants and represents that Buyer's assumption of the management and operation of the Companies as part of this Agreement and the cash consideration set forth in Section 1 below, constitute satisfactory consideration for this Agreement

P.   Molloy desires to sell and Buyer desires to so purchase such portion of Molloy's ownership interests so that upon completion of the purchase of Barnett's membership interests in the Companies, Buyer shall own a 51% membership interest in each Company and Molloy shall own a 49% membership interest in each Company.

**NOW, THEREFORE**, in consideration of the foregoing Recitals, which are an integral part of this Agreement, and the terms and conditions hereinafter set forth, the parties to this Agreement, and each of them, agree as follows:

1.   Concurrently with the purchase by the Buyer of all of Barnett's membership interests in the Companies, Molloy hereby sells to Buyer and Buyer hereby buys from Molloy such portion of Molloy's ownership in and of each of the Companies, free and clear of debts and encumbrances of any nature for the total sum of $100,000.00 (one hundred thousand dollars) (the "Purchase Price") payable $25,000.00 (twenty-five thousand dollars) upon Barnett signing a separate agreement with Buyer, and $25,000.00 (twenty-five thousand dollars) per month thereafter for a period of three months.

As further consideration under this Agreement, Buyer agrees that it will infuse working capital as it deems in its sole discretion necessary, from time to time, to remodel the Premises, pay debts of the Companies, and promote the operations of the Companies all as further needed in the sole discretion of the Buyer in an attempt to make the Companies profitable. The parties hereto and each of them agrees that the following are material conditions hereof:

A.   The total debt owed by the Companies at the moment of execution of this Agreement shall not exceed $200,000.00 and shall be comprised of that debt existing at the time of execution of this Agreement (the "Existing Debt"). Excepting only for the Existing Debt which shall not under any circumstances exceed $200,000.00 Molloy agrees to indemnify and hold safe and harmless the Companies and the Buyer from any and all debt over said $200,000.00, but only to the maximum 60% of the total amount over $200,000.00, and which shall be payable from amounts distributable to Molloy. Buyer shall determine how and when the Existing Debt is paid and to the extent Buyer is able to reduce the Existing Debt via negotiation with vendors, then Buyer shall be entitled to do so.

B.   Further Buyer will contribute monies to the Companies to be used towards remodeling of the Premises, marketing and working capital. The Buyer agrees to so contribute $150,000.00 for these purposes which monies shall be treated not as a loan but rather capital contribution to the Companies. Said $150,000.00 shall be contributed as and when needed, in increments as the Buyer in its sole and absolute discretion deems necessary. In addition, the Buyer may in its sole and absolute discretion further contribute monies to the Companies from time to time, which will be treated as a loan or loans to

Initials:   Buyer: ___ WC ___ SL ___ Molloy ___
Page 4 of 13

the Companies.  Of these additional amounts over and beyond $150,000.00 above referenced, the additional monies, if any, shall be treated as a loan to the Companies to be repaid over a maximum period of thirty-six months with fixed interest at the rate of 2% over the Wall Street prime interest rate at the time of the loan.

C.     Accordingly, the total monies Buyer shall contribute, as a material requirement under this Agreement is $250,000.00, which is inclusive of the $100,000.00 Purchase Price and the $150,000.00 referenced in 1B above.

D.     Buyer shall cause the Premises to be licensed to utilize the trade name "Spearmint Rhino Gentlemen's Club" and shall cause the Premises to be remodeled to reflect the trade dress typically apparent in existing Spearmint Rhino Gentlemen's Clubs located in the United States, Canada, Australia and England.

E.     Buyer shall assume all management duties of the Companies, including, but not limited to, employment matters, and resolving any licensing negotiations and payments with BMI, ASCAP and SESAC, including licenses not obtained or paid in 2009, 2010 and 2011. However liability under this Section E shall be inclusive of the debt and $200,000.00 maximum referenced in 1A above.

This Agreement becomes binding upon execution regardless of the approvals by governmental authorities regarding licensing or similar.  However in the event any governmental grant to operate with liquor and adult entertainment is denied, then at the sole option of Buyer, Buyer may rescind from this Agreement rendering this Agreement void without further obligation to Buyer. The parties hereto, and each of them acknowledge and agree that Buyer is hereby acquiring a majority ownership interest in the Companies and thereby acquiring majority voting rights of the Companies acting alone except as otherwise provided in this Agreement. The parties hereto, and each of them, hereby agree that contemporaneously with the execution hereof, this Agreement shall replace in its entirety, without exception, any and all management and operating and related or similar agreements associated or referencing the Companies and each of them. THE PARTIES HERETO AND EACH OF THEM HEREBY AGREE AND UNDERSTAND THAT IMMEDIATELY UPON THE EXECUTION HEREOF, BUYER IS ACQUIRING A MAJORITY OWNERSHIP INTEREST IN THE COMPANIES AND ACTING ALONE CONSTITUTES A MAJORITY OF EACH OF THE RESPECTIVE COMPANIES OWNERSHIP AND CONTROLLING INTEREST AND VOTING RIGHTS, ACTING ALONE.  The parties hereto and each of them further acknowledge and agree that the consideration paid herein by the Buyer for the majority ownership interest is fair, justified and appropriate in the circumstances.  The parties hereto, and each of them, hereby agree that contemporaneously with the execution hereof, this Agreement replaces in their entirety any and all operating and management agreements and all other agreements of any nature whatsoever related to or associated with the ownership, operation and management of the Companies and each of them.

Accordingly, Buyer is hereby acquiring a Fifty One percent (51%) member interest in each of the Companies, without restriction, further agreement or exception associated therewith for the full

Initials:   Buyer: ___  WCV: ___  St: ___  Molloy: ___
Page 5 of 13

and complete price as detailed herein, receipt of which is hereby acknowledged by Molloy, along with the Buyer's express covenant hereby made, to fully and reasonably operate the Companies and its Premises undertaking the Buyer's deemed necessary changes in numerous aspects in an effort to increase the existing gross and net sales of the Companies. The Buyer may contribute loans as deemed necessary in Buyer's sole discretion for the necessary and needed remodel, refurbishment and restocking of the Companies Premises, along with serving as working capital for marketing and management all to be used in the sole discretion of the Buyer. Said loans are to be fully repaid to Buyer prior to any member receiving any distributions or dividends.

2.   The parties hereto, and each of them, further acknowledge and agree that Buyer may, in Buyer's sole election, cause the Companies to contract outside service and/or management companies to assist the Companies, including entities associated with Buyer.  Buyer covenants that engagement of any contractor or management company affiliated with Buyer in any manner shall be engaged only upon such terms and conditions as are commercially custom to Spearmint Rhino typical licensed entities. Buyer further covenants that fees paid to Buyer, any principal in Buyer, and any affiliated of Buyer shall not exceed a combined total of six percent (6%) for consulting fees and shall not exceed a combined total of three percent (3%) for licensing fees computed on total gross sales of the Companies.

3.   The parties, and each of them, in addition to any other representations and warranties contained in this Agreement, individually and jointly, represents and warrants that all of the statements contained herein including the Recitals hereinabove are true and correct and that each party, is fully authorized and unrestricted to sell or buy any or all of their and the respective Companies ownership and management interest as herein detailed.

4.   Contemporaneously with the execution hereof, the Molloy, to the best of his ability, and Barnett (jointly hereinafter "Sellers") shall physically turn over all books and records of the Companies, of any and all natures whatsoever, maintained by the Sellers and the Companies, including, however not limited to, all accounting records, bank statements, all filed tax returns to all local, state and federal authorities, the Companies formation documents, membership agreements, management agreements, unused share certificates, canceled share certificates and seal (if applicable and utilized by the Companies), along with all other documents Buyer reasonably request.

5.   As soon as practical, following the execution of this Agreement, Molloy shall cooperate with Buyer to close all Company bank accounts in existence and open new accounts as deemed appropriate by the Buyer.

6    Commencing on the date of final execution of this Agreement, the Companies shall maintain a set of financial records clearly detailing all income, from any and all sources whatsoever of the Companies (hereinafter referred to as "Gross Revenues"), and all disbursements to any and all parties whatsoever by the Companies.  Financial records shall be recorded daily, Monday through Friday detailing all financial transactions of the Companies. Monday financial transactions shall include all immediately preceding Saturday and Sunday transactions unless those days are recorded separately on the Monday.  The Companies shall

Initials:     Buyer: ___   WC: ___   SL ___   Molloy: ___

Page 6 of 13

maintain a single bank checking account each, which shall receive 100% of all cash deposits and Gross Revenues (less documented and accounted for cash paid outs) as well as all check disbursements of the Companies. On or before the 15th day of each month, The Companies shall endeavor to cause to be prepared and mailed to each Seller a financial report detailing the income and expense of the Companies for the immediately preceding calendar month. The financial report shall include, however not be limited to, an income statement (also commonly known as a profit and loss statement) detailing all income and all expenses for the period reflected, a transaction report by category detailing each separate detailed transaction comprising each line item of the income statement, a printed check register detailing each and every deposit and disbursement to and from each Company's respective bank account for the period reflected, and a photocopy of the reconciled monthly bank statement. Each owner of any interest in a Company, with 24 business hours advance notice, shall have the right to review, make copies and inspect 100% of the Company's financial records, including all bills, invoices, bank statements, contracts, leases, and corporate records, at the location where such records are maintained by the Company. All such inspections and related actions shall be at the cost and expense of the requesting party.

7.     On the 15th day of each month after the execution hereof, so long as there are no loans outstanding to the Buyer by the Companies or any of them, the Companies shall distribute to each of the then owners of the Companies, in percentage of each owner's then respective ownership interest in the respective Company, all of the funds retained in the each of the Companies then respective single bank account derived from Gross Revenues over and beyond $35,000.00 (which sum shall be held and derived from Gross Revenues as operating capital) and after deduction and provisions for all accounts, loans and related payables and debts of the Companies. Said $35,000.00 is herein agreed upon by the parties hereto, and each of them, as the necessary and prudent sum to be maintained by the Companies, until changed by the Companies' management, for working capital within the Companies' bank accounts. These owner disbursements shall be computed as to amount due each owner as of the close of business on the last day of each month. Buyer shall use Buyer's best efforts to disburse the distributions from the Companies by 5:00 PM on the 15th day of the following month. If the 15th day falls on a holiday or weekend, then the disbursement will be made the following business day. All such owner disbursements shall be properly and appropriately reported to taxing authorities by the Companies and the Companies are hereby authorized to deduct and pay tax withholding on behalf of each owner as necessary or required. Each of the parties hereto agrees that the Companies may elect a partnership or equal tax status.

8.     Upon the written election of either Molloy or Buyer to the other, Buyer shall be entitled to and shall purchase all of Molloy's interests in the Companies upon the following terms and conditions:

A.     Except "for cause," the election to purchase Molloy's interests by Buyer shall not occur sooner than sixty (60) months after execution of this Agreement; and no later than sixty-three (63) months after execution of this Agreement. In the event however the election is made for cause then the election may be made by Buyer anytime after the date of this Agreement. The term "for cause" includes as it related to Molloy,

Initials:     Buyer: ___ WC: ___    SL: ___ Molloy: ___

conviction of a felony, gross interference with the employees or operations of the Companies, and any other action that endangers the licensing of the Companies for the purposes of operating the Companies' business. The term "for cause" does not include any marital divorce action involving Molloy unless Molloy's spouse alleges as community property or otherwise, she is entitled to ownership interest in the Companies.

B.      At any time after twelve (12) months from the date that Barnett executes an agreement to sell his interests in WCV to Buyer, Molloy shall have the right to exercise his right to sell his interest at any time and to any party, provided that if Molloy elects to sell his interest to Buyer the purchase price and provisions of this Section 8 shall control.

C.      Any purchase hereunder of Molloy's ownership interest shall be 100% of his interest in both of the Companies and not a portion thereof. In no event shall any of the Buyer's interest in the Companies be subject to being acquired by Molloy or otherwise without the advanced written consent of the Buyer separate from this Agreement.

D.      The purchase price for Molloy's interests in the Companies (the "Purchase Price") shall be the greater of (i) $500,000.00 or (ii) the fair market value ("FMV") of the companies. For the purposes of this Agreement, the parties agree that the FMV for the purchase of Molloy's interests in the Companies shall be Molloy's percentage of membership interest in each Company multiplied by the total value of the respective Company. The total value of the respective Company shall be equal to fifty percent (50%) of the combined gross revenues earned by the operations of the Company for the immediately preceding twelve (12) calendar months. For purposes of explanation and by way of example only: If a Company's combined gross sales for a 12 month period is $4,000,000.00 then the value of the Company would be $2,000,000.00 (50% of $4,000,000.00), and if Molloy then owns 49% of the Company the purchase price would be $980,000.00. Each Company shall be valued individually, and the combined total for the purchase of both Companies shall be paid to Molloy as the FMV Purchase Price. However any transactions between the 2 Companies shall not be used to compute income for the purposes of the FMV calculation.

E.      The Buyer shall pay Molloy the Purchase Price over a period not to exceed twenty-four (24) months, with 2% interest above the then Wall Street Prime Rate added on the unpaid portion thereof. The Buyer will commence payments Molloy within thirty (30) calendar days after written notice from Buyer or Molloy, as applicable, and shall continue the same day each consecutive month thereafter until paid in full. Concurrent with the first payment, Buyer will cause to be executed and delivered to Molloy a promissory note evidencing the amount owed as the Purchase Price. Molloy in turn will sign over his complete ownership interest and at that time surrender to Buyer all membership interests and benefits he has to the Companies.

9.      Molloy hereby warrants and represents that no debt other than those, if any,

Initials:    Buyer: \\\\ ____ WCV: ____ SI. ____ JV. ____ Molloy: ____
Page 8 of 13

described 1A above are owed by or from the Companies, and agrees to defend and hold harmless the Buyer and the Companies from any claims of debt or liability of any nature whatsoever, known or unknown, suspected or unsuspected, actual or contingent, originating or otherwise incurred at any time prior to the execution hereof, to the extend limited as provided in 1A above. In the event any debt undisclosed herein becomes known to the Buyer after the execution hereof, then the Buyer and the Companies each are hereby authorized to pay the debt and equitably deduct the same amount from any future monies otherwise due Molloy or Barnett (pursuant to the separate agreement between Buyer and Barnett for the purchase of 100% of Barnett's interests in the Companies) from any source of monies including, however not limited to, sale monies originating under Section 8 above.  This provision does not prohibit or otherwise interfere with Buyer being able to make claim that in such an event, that Molloy or Barnett, as applicable, misrepresented material facts in his respective agreement documents, or the ability for the Buyer to pursue any and all other remedies available to the Buyer. Molloy warrants and represent to the Buyers that all assets located in and about the Premises as inspected by Buyer are, except as otherwise described in 1A above, owned by the applicable Company free and clear of any encumbrance, claim or debt of any nature.

      10.   As a matter of disclosure only, Molloy acknowledges and agrees that the Buyer's intention following the execution hereof will be to cause the Companies to remodel the Premises and in so doing Buyer may solicit and receive monetary loans from third parties. However the Buyer agrees to contribute or loan such funds to the Companies in increments, as provided in Section 1B above. The parties hereto, and each of them, agree that any such loans made by Buyer and/or any individual or entity associated with the Buyer, shall be repaid in full prior to any disbursements being made by the Companies to the Sellers, and any one of them, for any reason or reasons whatsoever. The parties further agree that any loans from third parties shall be at a fixed interest rate of no more than 2% over the Wall Street prime interest rate at the time of the loan

      11.   Buyer acknowledges that the Lease includes an option for WCV to purchase the Premises. Buyer agrees that in the event that Buyer exercises the right to purchase the Premises, whether upon the same terms contained in the Lease or as such more beneficial terms may be negotiated by Buyer with the seller of the Premises, that Buyer shall take title to the Premises in the name of WCV or a sister or subsidiary entity. Upon closing of the purchase of the Premises, WCV shall continue to operate the business, or if the Premises business is being operated by SL then Buyer shall cause WCV to lease the Premises to SL upon terms and conditions reflective of then market conditions for like properties and uses of premises.

      12.   Buyer agrees and covenants with Molloy, and without causing a reduction in Molloy's membership interest in either Company, that Molloy shall not at any time be required to make any capital contribution to either Company and shall not be required to personally guaranty any loan or other obligation of either Company other than those warranties and representations made within this Agreement inclusive of its Exhibits.

      13.   Each of the individuals signing this Agreement for himself and the Companies represents and warrants that the signing of this Agreement and the transactions contemplated in

Initials:   Buyer:    WCV:    SL:    Molloy

Page 9 of 13

and by this Agreement have been duly authorized by the requisite action on the part of each individual and/or Companies as indicated.

14.   All notices and required mailings, which may or are required or permitted to be given by any and all parties hereto, shall be in writing.  All such notices shall be sent either US Certified Mail, Federal Express or by messenger with verified proof of receipt provided.  Notices shall be deemed received by the addressee upon receipt acknowledged, refused or returned as undelivered.  All notices shall be delivered to each party at the addresses detailed hereinbelow, or to such other address as any party hereto may from time to time designate in writing.

| | |
|---|---|
| To Buyer at: | Kathy Vercher, President |
| | SR Midwest 1, LLC |
| | 1875 Tandem Way |
| | Norco, California 92860 |
| | |
| To the Companies at: | Kathy Vercher, President |
| | SR Midwest 1, LLC |
| | 1875 Tandem Way |
| | Norco, California 92860 |
| | |
| To Molloy at: | 1308 South 119th Street |
| | Omaha, NE 68144 |

15.   This Agreement, inclusive of all referenced Exhibits, shall be binding upon and enure to the benefit of the Buyer and Sellers and their respective heirs, personal representatives, successors and assigns.

16.   In any action between the Buyer and/or Companies on the one hand and the Sellers or any one of the Sellers on the other hand, to enforce any of the terms or provisions of this Agreement, the prevailing party in the action shall be entitled, in addition to damages, injunctive relief or other relief, to its reasonable costs and expenses, including without limitation, costs and reasonable attorney's fees.

17.   The following Exhibits attached to this Agreement are incorporated into this Agreement by reference and fully made an integral part of this Agreement.

A.  Operating and Management Agreements of the Companies:

B.  Lease for the Premises:

18.   This Agreement shall be construed under the laws of the State of Delaware in effect at the time of the signing of this Agreement.

19.   This Agreement contains the entire understanding between the parties relating to the transaction contemplated by this Agreement.  All prior or contemporaneous agreements,

Initials:   Buyer: _____ W____ ____ S____ ____ Molloy ____
Page 10 of 13

understandings, representations, and statements, oral and/or written, are contained and merged within this Agreement and if not contained in this Agreement, shall be of no force or effect. Any reference, mention, or conveyance by the Buyer and/or any Buyer representative to the Sellers, or any of them, relating to anticipated performance by the Companies after the execution of this Agreement is agreed to have been made as a best guess and estimate only and the Sellers, and each of the them, herein agree that they are not in the execution hereof relying of any such representation and the Sellers, and each of them, have prior to respective execution hereof, each conducted an independent investigation to satisfy themselves fully that this Agreement is appropriate for them to execute and also that they have sought and received tax, accounting and legal advise regarding this Agreement and the advisability in their respective capacities regarding executing this Agreement.

20.  Any alteration, change or modification of or to this Agreement, in order to become effective, shall be made in writing and in each instance specifically reference this Agreement and be signed on behalf of each party.

21.  Sellers, and each of them, agree to immediately sign any other and further instruments and documents, as requested by the Companies or Buyer as may be reasonably necessary or proper in order to accomplish the intent of this Agreement.

22.  Buyer shall assume full, complete and unbndled possession and control of the Companies, the Premises and operations of the Companies contemporaneously with the execution hereof.

23.  If any term, provision, condition or covenant of this Agreement, inclusive of its Exhibits, is held, to any extent, invalid or unenforceable, by a court of competent jurisdiction, then the remainder of this Agreement shall remain valid and enforceable to the fullest extent of the law.

24.  Time is expressly made of the essence with respect to the performance by the parties hereto, and each of them, and every obligation and condition of this Agreement.

25.  Titles, captions, bold type and similar distinctions are for convenience only and shall not constitute a portion of this Agreement or alter the plain meaning of the language of this Agreement.

26.  This Agreement, along with its attached Exhibits, shall be considered one fully integrated agreement.

27.  Molloy hereby acknowledges and agrees that the nature of the Companies business and the desired and anticipated business of the Companies after the execution hereof, shall be that of an adult related business involving live female bikini entertainment, or nude or semi-nude entertainment, in conjunction with a full on premises liquor related license. As such it may be the case, after the execution of this Agreement, that the Companies are from time to time involved in litigation with various governmental entities regarding the Companies right to operate

Initials:   Buyer:____ WCV:____ SB:____ Molloy:____
Page 11 of 13

in said fashion and may further involve government applying criminal changes against employees, management, owners and/or others associated with the Companies in this regard. Accordingly, Molloy acknowledges this liability and hereby forever releases any claim or allegation against Buyer and Companies in this or related regard.

28.     The Agreement may be executed by the parties hereto, and each of them, in counterparts with the same force and effect as through each and every party hereto had signed one single original of this Agreement. Facsimile or electronic signatures shall be deemed the same as an original signature.

29.     As detailed herein, this Agreement replaces in its entirety any and all prior agreements between the Companies, Molloy, and each of them respectively and in any and all combinations of them. This includes, however is not limited to, all agreements, management agreements, operating agreement, employment agreements, loan agreements and all other agreements of the broadest possible interpretation between the mentioned parties. Further contemporaneous with the execution hereof, Molloy resigns from all employment, independent contractor, labor, consulting, manager, officer, director and all other positions of the broadest possible interpretation. Thus effectuated contemporaneously with the execution of this Agreement, the sole position and status of Molloy shall be solely that of a 49% interest owner of the Companies as set forth herein.

30.     The terms and conditions of this Agreement, and the obligations of Molloy and Buyer to perform such terms and conditions, are contingent upon Buyer obtaining 100% of Barnett's interests in the Companies, including the execution by Barnett of such waivers, releases, non-compete agreements, warranties and other documentation as Buyer may deem appropriate. In the event Buyer is unable to obtain 100% of Barnett's interests, or if Barnett fails or refuses to execute such documents as Buyer requires, in Buyer's sole discretion and option, then this Agreement shall terminate and neither Molloy nor Buyer shall have any further obligation to the other with respect to this Agreement. Except as provided in this paragraph 30, this Agreement shall be binding upon Buyer and Molloy.

Buyer
SR Midwest, LLC

_____ Date: 11/9/2011

Printed Name __Kathy Vereler__   Title __Manager__

WCV
World Class Ventures, LLC

_____ Date: September 16, 2011
Printed Name: Dan Molloy, manager and member

Initials:     Buyer: ___   WCV ___   SI ___   Molloy ___
Page 12 of 13

SL
Saries Lounge, LLC

Printed Name: Dan Molloy, manager and member _____ Date: September 16, 2011

Dan Molloy

Individually _____ Date: September 16, 2011

Initials:    Buyer: ___   WCV: ___   SL ___   Molloy: ___
Page 13 of 13

# AMENDMENT TO SALE OF MAJORITY OWNERSHIP INTEREST IN LIMITED LIABILITY COMPANY AND MEMBERS MANAGEMENT OPERATING AGREEMENT

This Amendment to Sale of Majority Ownership Interest in Limited Liability Company and Members Management Operating Agreement (the "Amendment") is made to that Sale of Majority Ownership Interest in Limited Liability Company and Members Management Operating Agreement entered into September 16, 2011 (the "Agreement") by and among, SR Midwest 1, LLC, a Delaware Limited Liability Company, (the "Buyer"); World Class Ventures, LLC, a Iowa Limited Liability Company (the "WCV"); Serie's Lounge, LLC, an Iowa Limited Liability Company ("SL"); and Dan Molloy, an individual (Molloy"). This Amendment serves to clarify, amend and change the Agreement only as follows:

1. Page 4 Section 1 of the Agreement is changed as follows:

   The Purchase Price payment is changed from *payable $25,000.00 (twenty-five thousand dollars) at the time of signing of Burnett's agreement, and $25,000.00 (twenty-five thousand dollars) per month for the next three months thereafter* to: payable $25,000.00 commencing the first day of the month following thirty (30) days after the Premises opens and commences trading to the general public under the trade name Spearmint Rhino Gentlemen's Club and continuing the first day of each consecutive calendar month thereafter for 3 additional months until the total Purchase price of $100,000.00 is paid.

2. Page 7 Section 7 shall now have the following provision added to the end of said Section:

   Each annual anniversary month of the Agreement for two (2) years after the date of the Agreement (September 2012 and September 2013), the Companies shall have endeavored to distribute to Molloy a minimum combined annual shareholder distribution of $25,000.00 (twenty five thousand dollars) comprised and calculated from the preceding twelve months operations of the Companies and if the Companies have not made sufficient net revenues to support such disbursements, then the Companies shall advance as a interest free loan payable from thereafter shareholder distribution, to Molloy the difference between that so distributed to Molloy and said $25,000.00 for each of the two (2) years.

3. As clarification Page 7 and 8, Section 8.B. shall be replaced in its entity with the following:

   Molloy may sell his interest only to Buyer in accordance with this Agreement. At any time after twelve (12) months from the date that Burnett executes an agreement to sell his interest in WCV to Buyer, Molloy shall have the right to exercise his right for Buyer to buy and Molloy to sell his interest to the Buyer.



EXHIBIT B

While the intent of the Agreement is that the sole buyer of Molloy's interest be the Buyer, if by operation of law, death of Molloy or other event, any party other than Molloy becomes an owner of any of the Molloy interest, Buyer retains the first right of refusal to acquire the interest by matching the price and terms and in any event any subsequent owner of any Molloy interest must contemporaneously become and remain party to and adhere to the complete terms, conditions and provisions of the Agreement including Section 8 et seq of the Agreement.

4.      The execution of this Amendment may be done in counterpart with the document treated as though executed in one sitting together by all parties and this document may be executed with signatures exchanged by fax or e-mail, which signatures shall serve in all regards as though original wet-ink signatures.

All remaining portions of the Agreement remain unaltered and in full force and effect.

Buyer /
Six Ashtiwell LLC

Date 11-10-11

Printed Name _____ Title _____

WCV
World Class Ventures, LLC

Printed Name _Dan Molloy JR_ Title _Owner_    Date _10·25-11_

_____                              Date _____

Printed Name _____ Title _____

SL
Series Lounge, LLC

Printed Name _Dan Molloy JR_ Title _Owner_    Date _10-25-11_

_____ Date_____

**Printed Name**_____ **Title**_____

Dan Molloy

Individually

IN THE DISTRICT COURT OF POTTAWATTAMIE COUNTY, IOWA

| | |
|---|---|
| DANIEL MOLLOY, an individual, | |
| Plaintiff, | CASE NO.: LACV110012 |
| vs. | |
| SR MIDWEST I, LLC., a Delaware Limited Liability Company, | ORIGINAL NOTICE |
| Defendant. | |

TO THE ABOVE NAMED DEFENDANT:

> SR MIDWEST I, LLC
> c/o Corporation Service Company
> 505 5th Avenue, Suite 729
> Des Moines, IA 505309

You are notified that a petition has been filed in the office of the clerk of this court naming you as the defendant in this action. A copy of the petition (and any documents filed with it) is attached to this notice. The attorney for Plaintiff is Frank Younes of Taylor, High & Younes, LLC., whose address is 661 N. 50th Street, Suite 200, Omaha, Nebraska 68132. That attorney's telephone number is (402)933-3345; facsimile number (402)933-3020.

You must serve a motion or answer within 20 days after service of this original notice upon you and, within a reasonable time thereafter, file your motion or answer with the Clerk of Court for Pottawattamie County, at the county courthouse in Council Bluffs, Iowa. If you do not, judgment by default may be rendered against you for the relief demanded in the petition.

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA coordinator at 712-328-5883.

(SEAL)

8-21-13

CLERK OF COURT
227 S. 6th Street
PO Box 476
Pottawattamie County Courthouse
Council Bluffs, Iowa 51502

## IMPORTANT

YOU ARE ADVISED TO SEEK LEGAL ADVICE AT ONCE TO PROTECT YOUR INTERESTS.

[Report 1976; Report 1978, effective July 1, 1979; April 30, 1987, effective July 1, 1987; October 31, 1997, effective January 24, 1998; November 9, 2001, effective February 15, 2002]